IN THE UNITED STATES DISTRICT COURT

FOR THE NORTHERN DISTRICT OF CALIFORNIA

| | |
|---|---|
| FLOR BARRAZA and NIKOLE HENSON, individuals, on behalf of themselves and others similarly situated,<br><br>Plaintiffs,<br><br>v.<br><br>CRICKET WIRELESS LLC and LEAP WIRELESS INTERNATIONAL, INC.,<br><br>Defendants. | No. C 15-02471 WHA<br><br>**AMENDED ORDER DENYING MOTION TO COMPEL ARBITRATION AND SETTING SCHEDULE FOR SUMMARY TRIAL** |

## INTRODUCTION

In this false-advertising action, defendants move to enforce arbitration clauses in their agreements with plaintiffs. For the reasons stated below, defendants' motion is **DENIED**. A trial is necessary to determine whether plaintiffs agreed to the terms and conditions of defendants' service, which included those arbitration clauses.

## STATEMENT

At all relevant times, defendant Cricket Wireless, LLC, sold wireless telephone service as well as cellular telephones to consumers. Until May 2014, when it was acquired by AT&T, Inc., Cricket advertised that it offered "No Contract" wireless service. After that acquisition, Cricket began advertising that its service had "No Annual Contract." Defendant Leap Wireless International, Inc., contends it is not a proper defendant inasmuch as it does not offer wireless

1  services to consumers. As the parent company of Cricket prior to both companies' acquisition
2  by AT&T, it joins in this motion and asserts the same right to compel arbitration.
3      Plaintiffs Flor Barraza and Nikole Henson each purchased wireless service with
4  accompanying phones at Cricket-owned stores in 2013. Barraza and Henson respectively
5  purchased a Samsung Galaxy S4 and a Samsung Galaxy S3. The phones came in boxes, but
6  when plaintiffs selected their phones, the Cricket employees helping them went to the back of
7  the store and returned with the boxes already open, and the employees activated the phones
8  (Henson Decl. ¶¶ 12–13; Barraza Decl. ¶ 5). One panel on those boxes included the following
9  text, written in small font within a much longer paragraph that also discussed signal frequency
10 and battery performance (Basham Decl., Exhs. 2, 8):

> Use of phone requires purchase of Cricket® service, which must be purchased separately. By activating Cricket® service, you agree to the enclosed terms and conditions of the service.

13  The full terms and conditions for Cricket's service were included in a 3x4 inch booklet,
14 which was titled "Quick Start Guide." The front cover of the booklet included the title of the
15 booklet, with the subtitle "A Simple Guide to Activating Your Phone." It also included the
16 instruction "Read Me First." The back cover was written upside down and in Spanish, with a
17 similar design to the front cover. Below is a depiction of the front cover of the booklet (Basham
18 Decl., Exh. 11):



2

The first page of the Quick Start Guide described Cricket as "the home of no contract, no hassle wireless," and did not mention that the booklet contained terms and conditions for the use of Cricket's service. Pages six through fifteen of the Quick Start Guide included numerous terms and conditions written in a smaller font than the rest of the contents of the booklet. The terms and conditions in the Quick Start Guide included the following provision, enlarged considerably for the convenience of the reader of this order (*id.*, Section 1(b)):

> IMPORTANT: WHEN YOU START SERVICE OR USE THE SERVICE BY, FOR EXAMPLE, PLACING A CALL, SENDING A MESSAGE, OR TRANSMITTING DATA ON THE CRICKET WIRELESS SYSTEM OR ANOTHER SYSTEM THAT'S AGREED TO CARRY OUR SERVICES, YOU INDICATE YOUR ACCEPTANCE OF THIS AGREEMENT.  IN ADDITION, EACH TIME YOU PAY FOR SERVICE FROM US, YOU CONFIRM YOUR ACCEPTANCE OF THIS AGREEMENT.  IF YOU DO NOT WANT TO ACCEPT THIS AGREEMENT, DO NOT START SERVICE OR USE THE SERVICE AND RETURN YOUR WIRELESS DEVICE . . . FOR A REFUND

Section 20(a) of the Quick Start Guide included this arbitration provision and class-action waiver, again blown up for purposes of legibility of this order:

> YOU AND WE ARE WAIVING RIGHTS TO PARTICIPATE IN CLASS ACTIONS, INCLUDING WITHOUT LIMITATION CLASS ACTIONS BEGUN BY OTHERS PRIOR TO THIS AGREEMENT.  EVEN IF APPLICABLE LAW PERMITS CLASS ACTIONS OR CLASS ARBITRATIONS, YOU ARE WAIVING ANY RIGHT TO PURSUE ANY SUCH CLAIM OR CONTROVERSY AGAINST US (OUR AFFILIATES, PREDECESSORS OR SUCCESSORS IN INTEREST) ON A CLASS BASIS.  WE, IN TURN, WAIVE ANY RIGHT TO PURSUE ANY SUCH CLAIM OR CONTROVERSY AGAINST YOU ON A CLASS BASIS.

The arbitration provision allowed the party initiating arbitration to select either of two different arbitration administrators and expressly allowed customers to opt out of the application of the arbitration agreement within sixty days without any adverse effect on their service.

At the time plaintiffs purchased their phones, Cricket required its employees to hand any customer purchasing a new phone Cricket's "Half Is More" promotional pamphlet (or to have it stapled to the receipt), which stated, "Terms, conditions and other restrictions apply" to Cricket's services, written in five-point font (Wisner Decl. ¶ 6, Exh. A). Similarly, Cricket made yet

3

1   another handbook called "My Cricket Guide" available within its stores (*id.* ¶ 8). That handbook
2   included the following text, also written in five-point font (*id.*, Exh. B at 21):

> Your Agreement with Cricket Communications, Inc., and its affiliates doing business as Cricket includes terms of your service plan (including those outlined below) and the most recent Cricket Terms and Conditions of Service available at www.mycricket.com. Carefully read all the Cricket Terms and Conditions of Service which include, among other things, a MANDATORY ARBITRATION of disputes provision.

7   Both plaintiffs aver that they saw the "Half Is More" pamphlet and the "My Cricket Guide"
8   handbook on display at the Cricket stores where they purchased their phones, but they claim they
9   were never given those materials and never reviewed them (Barraza Decl. ¶¶ 9, 16; Henson Decl.
10  ¶¶ 15–16).

11      Henson also purchased a Cricket PAYGo card in 2013 at a gas station in order to reload
12  the balance on her account. That card read, "By using your Cricket service or phone, or by
13  increasing your account balance, you acknowledge your consent to the current Cricket Terms
14  and Conditions of Service" (Basham Decl., Exh. 10). Henson changed her service plan in 2014.
15  Henson avers that she made this change over the phone (Henson Decl. ¶ 24). Cricket's internal
16  records suggest, by contrast, that she physically went to a store in Roseland Park, Kansas, to
17  make this transaction, where Cricket contends Henson received a receipt (Towster Decl. ¶¶ 4–6,
18  Exhs. A–B). The back of Cricket's printed receipts in the store included a reference to the terms
19  and conditions, including a reference to the web site that displayed Cricket's then-current terms
20  and conditions (Range Decl. ¶ 5, Exh. A). The text on the receipt also mentioned that the terms
21  and conditions included an "agreement to dispute resolution by binding individual arbitration
22  instead of jury trials or class actions" (*ibid.*).

23      Barraza and Henson terminated their service with Cricket in 2015 and 2014, respectively.
24  The Quick Start Guide provided that their obligations under the arbitration agreements would
25  survive the termination of the underlying agreement.

26      Barraza commenced this action in state court in California in May 2015, claiming that
27  Cricket "marketed UNLIMITED 4G/LTE services throughout the United States" but did not
28  actually have the capability to provide unlimited 4G/LTE services, in violation of various state

4

false advertising laws. Defendants removed the action to federal court here in San Francisco under the Class Action Fairness Act. After removal, Barraza amended the complaint to include Henson as a plaintiff. Plaintiffs sue on behalf of a putative class of purchasers of Cricket's services from 2012 to 2014, but the facts regarding anyone other than Barraza and Henson are irrelevant at this stage.

Defendants now move to enforce the arbitration clauses in the terms and conditions for Cricket's services as laid out in the Quick Start Guides provided to Barraza and Henson. Barraza and Henson do not contest the substantive fairness of those arbitration provisions, but they argue they never agreed to those provisions in the first place. This order follows full briefing and oral argument.

**ANALYSIS**

Defendants contend that when plaintiffs began using Cricket's wireless service, they accepted the terms and conditions set forth in the Quick Start Guide, including the arbitration provisions. Plaintiffs argue that they lacked notice of the terms and conditions in the Quick Start Guide, so they never agreed to that contract. They also argue that even if they did agree to the terms and conditions, Cricket should be estopped from enforcing a contract between the parties because it advertised that it offered "No Contract" service.

The parties agree that the Federal Arbitration Act governs the enforcement of the arbitration provisions in Cricket's terms and provisions. The FAA requires the enforcement of arbitration provisions "save upon such grounds as exist at law or in equity for the revocation of any contract," such as state law defenses to contract enforcement. 9 U.S.C. 2. If there is a genuine issue of material fact as to the formation of an arbitration agreement, "the court shall proceed summarily to the trial thereof." 9 U.S.C. 4.

Plaintiffs presumed that California law applied to both of their claims and defenses, but for the first time in their reply, defendants noted that Missouri law applies to Henson's challenges to the contract because she purchased and primarily used her phone in Missouri, where she lives. Notwithstanding defendants' sandbagging, this order considers the issues under both California and Missouri law and finds each compels the same result — there is a genuine

5

1  dispute of fact as to whether a contract was formed between the parties, which must be resolved
2  by a summary trial on that limited issue.

### 1. CONTRACT FORMATION.

The "existence of a contract as a whole must be determined by the court prior to ordering arbitration." *Sanford v. MemberWorks, Inc.*, 483 F.3d 956, 962 (9th Cir. 2007). That determination is done according to "state-law principles that govern the formation of contracts." *Nguyen v. Barnes & Noble, Inc.*, 763 F.3d 1171, 1175 (9th Cir. 2014). Although a party generally cannot avoid the terms of a contract on the grounds she failed to read it, that rule does not apply "when the writing does not appear to be a contract and the terms are not called to the attention of the recipient." *Marin Storage & Trucking, Inc. v. Benco Contracting and Engineering, Inc.*, 89 Cal. App. 4th 1042, 1049–50 (2001). Similarly, under Missouri law, a party must have reasonable notice, whether actual or constructive, of an agreement in order to assent to it. *Major v. McCallister*, 302 S.W.3d 227 (Mo. Ct. App. 2009).

Defendants contend that plaintiffs had ample notice that the Quick Start Guide included terms and conditions that would apply upon the activation of their service. Plaintiffs admit that they received the Quick Start Guide itself, which contained the relevant terms and conditions, but because Cricket's employees activated their phones at the store, Barraza and Henson had no reason to review the guide, and because the guide did not appear contractual in nature, they contend it could not serve as constructive notice of the agreement.

Plaintiffs primarily rely on *Norcia v. Samsung Telecommunications America, LLC*, No. 14-00582, 2014 WL 4652332 (N.D. Cal. Sept. 18, 2014) (Judge James Donato), *appeal filed*, No. 14-16994 (9th Cir. Oct. 14, 2014). There, after a bench trial to determine the validity of the arbitration agreement, Judge Donato denied the defendant's motion to compel arbitration because the arbitration provision was inconspicuously located in a 101-page booklet called "Product Safety & Warranty Information." Arbitration was not mentioned until page 76. The box included a notice that indicated it contained a "Product Safety & Warranty Brochure," although the box was already opened by an employee when it was presented to him. Those facts did not give rise to inquiry notice. *Id.* at *6. Defendants attempt to distinguish *Norcia* because

6

the plaintiff therein did not actually receive the box or the warranty booklet therein, however, that decision explicitly held that because the plaintiff declined the box *voluntarily*, he had to be treated as though he had received it. *Ibid.*

Nevertheless, several district courts have found inquiry notice based on documents enclosed in wireless phone packages, contrary to *Norcia*.

In *Dang v. Samsung Electronics Co., Ltd.*, No. 14-00430, 2015 WL 4735520 (N.D. Cal. Aug. 10, 2015) (Judge Lucy H. Koh), *appeal filed*, No. 15-16768 (9th Cir. Sept. 4, 2015), Judge Koh granted the defendants' motion to compel arbitration, finding that an arbitration provision on the fifth page of an "Important Information" booklet enclosed in the packaging for a wireless telephone, which was also referenced on a panel of the box that included a long paragraph of small-font text, was sufficiently conspicuous to constitute constructive notice of the contractual terms therein. Judge Koh acknowledged the decision in *Norcia*, but elected to follow four other district court decisions, also cited by our defendants, which found product safety and warranty booklets in product packages sufficiently contractual in nature to provide inquiry notice of the agreements therein. *See McNamara v. Samsung Telecommunications America, LLC*, No. 14-1676, 2014 WL 5543955 (N.D.Ill. Nov. 3, 2014) (Judge Harry D. Leinenweber); *Sheffer v. Samsung Samsung Telecommunications America, LLC*, No. 13–3466, 2014 WL 506556 (C.D.Cal. Jan. 30, 2014) (Judge George H. Wu); *Han v. Samsung Telecommunications America, LLC*, No. 13–3823, 2014 WL 505999 (C.D.Cal. Jan. 30, 2014) (Judge George H. Wu); *Carwile v. Samsung Telecommunications America, LLC*, 2013 U.S. Dist. LEXIS 185089 (C.D.Cal. July 9, 2013) (Judge Cormac C. Carney).

Similarly, in *Arellano v. T-Mobile USA, Inc.*, No. 10-5663, 2011 WL 1362165 (N.D. Cal. Apr. 11, 2011), an arbitration agreement in a document titled "Terms & Conditions," enclosed in the box for a cellular phone was held enforceable. Plaintiffs were given inquiry notice of the contract offer contained in the box both because they signed a service agreement that incorporated those terms by reference and because the document in the box was titled "Terms & Conditions," which was obviously contractual. *Id.* at *5.

7

This order need not resolve the apparent split among *Norcia*, *Dang*, *Arellano*, and other similar decisions in our circuit, as our case is distinct from each of them.  Here, the Quick Start Guide lacked *any* indication of its contractual nature, contrary to the documents considered in *Dang*, *Arellano*, and other prior decisions.  The Quick Start Guide, subtitled "A Simple Guide To Activating Your Phone," made no mention of contracts, agreements, terms and conditions, or warranties in the front matter, contrary to each of the decisions discussed above.  The contractual nature of the Quick Start Guide document was far from obvious, so its inclusion in the box was insufficient to place plaintiffs on inquiry notice of the terms and conditions.

Cricket does not dispute that its employees opened the boxes before giving them to plaintiffs and then activated plaintiffs' phones for them.  With this conduct, the employees obviated the need for plaintiffs to review the Quick Start Guide and signaled that it was unimportant to review the text on the box before activating the service.  Thus, plaintiffs lacked constructive notice of the terms and conditions in the Quick Start Guide based on its inclusion in the product packages, and they had no reason to review the small text printed on the box.[1]

Defendants make much of the fact that plaintiffs had sixty days to opt out of the arbitration provisions without any adverse consequences and that numerous consumers have exercised that option, but that is irrelevant if plaintiffs never agreed to be bound by the provisions in the first place.  An employee of a telephone service provider or an attorney may be attuned to the possibility that an arbitration agreement would be buried in a document titled "Quick Start Guide," while a reasonable consumer is unaware of that possibility.

Furthermore, plaintiffs had no reason to consult the other materials in the store, and they contend they never received those materials.  Nor did Henson have any reason to read the inconspicuous references to terms and conditions on the back of her PAYGo card or her in-store receipt, which she avers she never did.  This order rejects, however, plaintiffs' contention that the notices on the back panel of the box and in the other materials that Cricket made available were insufficient to put plaintiffs on inquiry notice that the box contained a contract because

---

[1] Ultimately, any class might be limited to those customers for whom the boxes were opened and the phones activated by an employee in the store.

8

those notices referred to "terms and conditions" rather than explicitly using the word "contract."

Defendants dispute the credibility of plaintiffs' declarations that they never reviewed any of the promotional materials in the Cricket store and so lacked inquiry notice. Specifically, plaintiffs both recall the materials available in Cricket's store several years ago with great specificity (and describe them with similar language), even though they claim they never read those documents. That issue cannot be resolved as a matter of law. A summary trial is necessary to resolve the credibility issues regarding whether plaintiffs actually read materials that would have informed them that certain terms and conditions applied to their service with Cricket, which would, in turn have led them to consult the documents contained in the product box or to Cricket's website.

### 2. EQUITABLE ESTOPPEL DOES NOT APPLY.

Plaintiffs argue that equitable estoppel should apply to prevent Cricket from enforcing the arbitration clauses included in the Quick Start Guide because it advertised that it offered "No Contract" service. Under California law, "the required elements for an equitable estoppel are: (1) the party to be estopped must be apprised of the facts; (2) the party to be estopped must intend his or her conduct shall be acted upon, or must so act that the party asserting the estoppel had a right to believe it was so intended; (3) the other party must be ignorant of the true state of facts; and (4) the other party must rely upon the conduct to his or her injury." *Cotta v. City & County of San Francisco*, 157 Cal. App. 4th 1550, 1567 (2007). It is "[a]n essential element of equitable estoppel is that the party to be estopped . . . 'intended by [its] conduct to induce reliance by the other party, or acted so as to cause the other party reasonably to believe reliance was intended.'" *Id.* at 1567. Similarly, under Missouri law "[t]he essential elements of an equitable estoppel as related to the party estopped are: (1) Conduct which amounts to a false representation or concealment of material facts, or, at least, which is calculated to convey the impression that the facts are otherwise than, and inconsistent with, those which the party subsequently attempts to assert; (2) intention, or at least expectation, that such conduct shall be

9

acted upon by the other party; (3) knowledge, actual or constructive, of the real facts." *Ethridge v. TierOne Bank*, 226 S.W.3d 127, 133 (Mo. 2007).

Whether or not plaintiffs can demonstrate that they relied on Cricket's "No Contract" ads in purchasing wireless service, which defendants dispute, they have failed to demonstrate that Cricket acted with the intention or expectation that Cricket intended such reliance. "No Contract" in the context of advertisements for telecommunications services is meant to distinguish services with annual commitments from those that do not require such commitments. There is no evidence that Cricket intended its "No Contract" ads to trick consumers into unknowingly assenting to arbitration, rather than to convey Cricket's offer of service without an annual commitment. Defendants cannot now be precluded from enforcing contracts against plaintiffs, although, as discussed above, a summary trial is necessary to determine whether such contracts were ever formed.

Nevertheless, at the summary trial, the "No Contract" ads may be a factor to take into account in determining the reasonable expectations of the parties.

## CONCLUSION

For the reasons stated above, defendants' motion to compel arbitration is hereby **DENIED**. A summary jury trial is necessary to determine whether plaintiffs agreed to the terms and conditions contained in the Quick Start Guide enclosed with their wireless phones. This will be a trial only as to plaintiffs inasmuch as this is not yet a class action. The trial shall begin on **DECEMBER 15 AT 7:30 A.M.** The pretrial conference is scheduled for **DECEMBER 9 AT 2:00 P.M.** Both sides should cooperate in expedited discovery on the factual matters in play on this motion, and failure to cooperate may lead to preclusion or adverse inferences as a sanction. Although certain arguments have been rejected (or accepted) in this order, both sides will be free at the summary trial to re-assert them in the context of a more comprehensive record.

**IT IS SO ORDERED.**

Dated:   November 3, 2015.

WILLIAM ALSUP
UNITED STATES DISTRICT JUDGE